Vivian **SPENCER** et al., Plaintiffs,

v.

George F. **KUGLER,** Attorney General of New Jersey, Carl Marburger, Commissioner of Education and the State Board of Education of the State of New Jersey, Defendants.

Civ. A. No. 1123–70.

United States District Court, D. New Jersey.

May 13, 1971.

---

Harold J. Ruvoldt, Jr., Jersey City, N. J., for plaintiffs.

Stephen G. Weiss, Sp. Counsel, Wayne, N. J., for defendants.

## OPINION

Before FORMAN, Circuit Judge,* and BARLOW and WORTENDYKE, District Judges.

WORTENDYKE, District Judge:

This action was commenced on August 18, 1970 by the filing of a complaint by Vivian Spencer and Geraldine Chavis by their respective guardians ad litem against George F. Kugler, Attorney General of New Jersey, Carl Marburger, Commissioner of Education, and the State Board of Education of the State.

This Court's jurisdiction is invoked under: (a) 28 U.S.C. § 1331, as arising under § 1 of Amendment 14 of the United States Constitution; (b) 28 U.S.C. § 1343 to redress the alleged deprivation under color of the law of New Jersey of rights secured by § 1 of Amendment 14 of the same constitution, and (c) §§ 1981, 1983 and 1988 of 42 U.S.C. §§ 1983, 2000a et seq. (The Civil Rights Act of 1964).

Plaintiffs are citizens of the United States and of the State of New Jersey and sue on their own behalf and under Rule 23(a) (2) of the Federal Rules of Civil Procedure on behalf of all other Black Americans similarly situated who attend the public schools of New Jersey,

---

* Judge Forman heard the argument in this case but due to illness was unable to participate in the writing of the opinion.

which were established pursuant to a constitutional mandate to "provide for the maintenance and support of a thorough and efficient system of free public schools" as prescribed in 1947 New Jersey Constitution Article VIII, § 4 par. 1. Each of the infant plaintiffs and members of the class they purport to represent is a Black American who attends the public schools of New Jersey so maintained and supported.

Defendant Kugler is Attorney General of New Jersey charged with enforcement of the laws. Defendant Marburger is Commissioner of Education of New Jersey and the State Board of Education is a public body charged with the supervision of Public Schools in that State.

Plaintiffs allege that the public schools of New Jersey are "racially imbalanced" which "violates the equal protection clause of the United States Constitution and the Civil Rights Act of 1964 and deprives the plaintiffs and the class they represent of federally guaranteed rights" and they "will be irreparably harmed if another school year commences without correction of the aforementioned condition."

Plaintiffs demand judgment:

1. Directing defendants to terminate the racial segregation of the New Jersey schools "forthwith".

2. Directing defendants to file a plan with this Court (a) to correct the racial imbalance of the schools "at the start of the semester immediately after the entry of judgment herein"; (b) to provide compensatory education in those districts which are racially imbalanced immediately and/or to provide funding for said programs.

3. Directing defendants to cease and desist from continuing a segregated system of public schools.

In the second count the allegations of the first count are incorporated by reference. "The schools * * * are racially imbalanced by reason of N.J.S. 18A:8–1 to 42 and N.J.S. 18A:38–1 to 24 which sets school district boundaries thereby rendering racial balance mathematically impossible in many districts, thus providing unequal educational opportunities. The State has taken no steps to achieve racial balance by reason of the mathematical composition of the geographical area which comprises the school district, has not attempted to redraw school district lines to achieve racial balance, has not provided funds for compensatory education to overcome adverse educational effects of racial imbalance." The State has failed to act "in the foregoing area in violation of the equal protection clause of the United States Constitution and the civil rights of the plaintiffs and the class they represent. The State is obligated to integrate all the schools or to provide compensatory education in those districts which it does not integrate. The school districts lacked the power to achieve racial balance."

Plaintiffs contend they and the class they represent will be irreparably harmed if another school year commences without correction of the aforementioned condition.

Relief prayed:

(a) Convention of three judge court

(b) Judgment enjoining defendant from continuing said system of schools

(c) Declaratory judgment declaring N.J.S. 18A:8–1 to 42 and 18A:-38–1 to 24 unconstitutional

(d) Permanent injunction against enforcement of N.J.S. 18A:8–1 to 42 and 18A:38–1 to 24

(e) Judgment directing defendants to redraw school district lines and submit a plan for new school district lines to be in effect prior to the opening of schools for the next semester immediately following entry of judgment herein

(f) Judgment directing defendants to submit a plan for providing compensatory education to those districts which are racially imbalanced immediately and/or to provide the funding for such programs

Defendants urge this Court to abstain from deciding the issues presented by the complaint. The doctrine of federal abstention first appeared in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), based on comity between the federal and state judicial systems, and the desire to avoid friction between them through premature interference with state legislative policy and statutory interpretation.

■ The power to abstain is one residing in the sound discretion of the Court. In a civil suit attacking a state statute on federal constitutional grounds the federal court should hear and decide the case unless the statute is fairly subject to an interpretation which will avoid or modify the federal constitutional question. NAACP v. Bennet, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375 (1959); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 2 L.Ed.2d 182 (1968). The statutes here in question are not subject to such an interpretation. A limitation on this rule occurs in cases when the identical issue is pending in the state court, Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). Defendants contend that the state court case of Robinson v. Cahill raises issues identical to those in the case *sub judice*. That suit alleges a violation of equal protection resulting from the taxing measures used to finance education; but does not attack the purported racial imbalance in the schools. The issues framed in the pleadings before this constitutional court are not being considered in any on-going state court action.

■ Ultimately, this Court relies upon McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), in refusing to abstain in this case. The Court in *McNeese, supra*, stated:

"[P]etitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment. It is immaterial whether respondents conduct is legal or illegal as a matter of state law. Such claims are entitled to be adjudicated in the federal courts." [at p. 674, 83 S.Ct. at p. 1437] [citations omitted].

Plaintiffs' substantive claim rests wholly on the assertion that there is an affirmative constitutional duty to achieve racial balance among the several districts of a state system of public schools; and that a failure to do so is in violation of Fourteenth Amendment rights. In view of the alleged deprivation of Fourteenth Amendment rights, *Spencer* is not an appropriate case for abstention.

In his Appendix presented to the Court on the oral argument counsel for the plaintiffs included a copy of the Opinion of the United States Court of Appeals for the Third Circuit filed September 23, 1970 in Porcelli, et al. v. Titus, Superintendent of Schools, etc., 431 F.2d 1254 (3rd Cir. 1970), and relied on the following in support of his contention:

"State action based partly on considerations of color, when color is not used per se, and in furtherance of a proper governmental objective, is not necessarily a violation of the Fourteenth Amendment. Proper integration of faculties is as important as proper integration of schools themselves, as set forth in Brown v. Board of Education, 349 U.S. 294, 295, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the thrust of which extends to the selection of faculties. In Kemp v. Beasley, 8 Cir., 389 F.2d 178 (1968), the court held, at 189, where race was a consideration in the selection of teachers and faculties, 'We reaffirm the principle that faculty selection must remain for the board and sensitive expertise of the School Board and its officials.' And, at page 190, 'The question thus becomes, when is there such faculty distribution as to provide equal opportunities to all students and to all teachers—whether white or Negro? Students in each school should have the same quality of instruction as in any other school. Every predominantly Negro school should have,

wherever possible, substantially as integrated a faculty as the predominantly white school.'" [at p. 1257]

Neither *Porcelli* nor *Kemp* is an authority for the contention of the plaintiffs in the case before us that the predominance of blacks in a public school to which both blacks and whites are admitted amounts to the segregation disapproved in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Brown* rejected the "separate but equal" doctrine announced in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). *Brown* was based upon the finding that "segregation is a denial of the equal protection of the laws," but expressly refrained from consideration of the question of whether "segregation also violates the Due Process Clause of the Fourteenth Amendment." It described the effects of segregation in the language of the United States District Court for the District of Kansas where the action originated as follows:

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.' " [at 494, 74 S.Ct. at 691]

In none of the schools of which the plaintiffs complain is any black pupil "segregated" from any white pupil. Indeed, complaint is made that the blacks who reside in the school district served predominate over the whites, thus affording an example of complete desegregation which was the expressed object of the court in the *Brown* case. At page 487 of the Opinion at page 688 of 74 S.Ct. in *Brown* it is stated that:

"In each of the cases [from Kansas, South Carolina, Virginia and Delaware] minors of the Negro race, through their legal representatives, seek the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis. In each instance, they had been denied admission to schools attended by white children under laws requiring or permitting segregation according to race."

Such is not the basis upon which each of the plaintiffs in the present case seeks relief in this cause. On the contrary plaintiffs would have a substantial portion of the pupils now in attendance in their respective schools ordered by the court removed from these schools and assigned to a school in another district. Alternatively plaintiffs would have the court abolish the respective districts in which their schools are located and assign them to other districts in which the disproportion between white and black students is reduced in one direction or the other. If, as plaintiffs contend, the proportionate black attendance in their respective schools adversely affects the degree of excellence of education which they can receive there must be a point at which any excess of blacks over whites is likely to impair the quality of the education available in that school for the black pupils. Nowhere in the Appendix filed by the plaintiffs or in the facts involved in any of the judicial precedents which they cite are we informed of the specific racial proportions which are likely to assure maximum excellence of the educational advantages available for the whites. Assuming further that efforts to achieve the ideal interracial proportion necessarily include the alteration of the population factor determinative of the redistricting, there can be no assurance that the population factor will remain static. If so, it would be necessary to successively reassign pupils to another district as the rate of births and graduations alters the racial proportions creating the demand for the educational

facilities as it changes from term to term. In sum, the difficulty complained of does not amount to unconstitutional segregation.

As the foregoing summary of the complaint discloses the plaintiffs charge that the "racial imbalance" of the New Jersey public schools "violates the Equal Protection Clause of the United States Constitution and the Civil Rights Act of 1964 and deprives the plaintiffs * * * of federally guaranteed rights" and that they "will be irreparably harmed if another school year commences without correction of the aforementioned condition." Plaintiffs plead jurisdiction in this Court under § 1 of the Fourteenth Amendment to the United States Constitution and deprivation of rights under the Civil Rights Act of 1964. Nowhere in the complaint nor in the brief or Appendix of the plaintiffs is there any specific disclosure of the particulars of the violations charged, other than the contention that in public schools in which the black pupils predominate less than the same educational and social advantages prevail.

Plaintiffs recognize and affirmatively plead that the public schools of New Jersey were established pursuant to the mandate of the State Constitution "to provide for the maintenance and support of a thorough and efficient system of free public schools." 1947 N.J. Constitution Article VIII, § 4 par. 1. Plaintiffs do not, however, concede, in the form of their general contention, that they do not enjoy the advantages of other public schools by reason of the racial disproportion of the pupils therein. Further, they do not particularize the disadvantages of which they complain or the respects in which the schools they attend fall short of compliance with the State mandate. The pleadings are silent respecting the legislative implementation of the constitutional directive, although the legislative provisions for such implementation are uncondemned and exempted from the plaintiffs criticism.

█ The New Jersey Legislature has provided in Title 18A Chapter 8 §§ 1 et seq. of the New Jersey Statutes as follows:

"*18A:8-1. Municipalities as separate school districts; exceptions*

Each municipality shall be a separate local school district except as otherwise provided in this chapter and except that each incorporated village shall remain a part of the district in which it is situated at the time of its incorporation.

*18A:8-2. Certain new municipalities as type II districts*

Whenever a new municipality other than a city is created from parts of two or more municipalities, such municipality shall be a separate type II school district from the time of appointment of the board of education for the new school district."

It is clear that these legislative enactments prescribe school district boundaries in conformity with municipal boundaries. This designation of school district zones is therefore based on the geographic limitations of the various municipalities throughout the State. Nowhere in the drawing of school district lines are considerations of race, creed, color or national origin made. The setting of municipalities as local school districts is a reasonable standard especially in light of the municipal taxing authority. The system as provided by the various legislative enactments is unitary in nature and intent and any purported racial imbalance within a local school district results from an imbalance in the population of that municipality-school district. Racially balanced municipalities are beyond the pale of either judicial or legislative intervention.

Plaintiffs, in support of their allegations, have cited numerous judicial authorities among them, of course, *Brown, supra,* the landmark decision on the segregation issue. *Brown* rejected the "separate but equal" doctrine of Plessy v. Ferguson, *supra,* and stated that "opportunity of an education is a right which must be made available to all on

equal terms." *Brown* never required anything more than a unitary school system. The decisions which followed *Brown,* to which plaintiffs point as further interpretations of the standards imposed by it, do not support plaintiffs' contentions. Those cases hold that a violation of 14th Amendment rights might result from a mere passive refusal to redistrict *unreasonable* boundaries. Webb v. Board of Education, 233 F. Supp. 466 (N.D.Ill.1963); Bell v. School City of Gary, 213 F.Supp. 819 (N.D.Ind. 1963) aff'd 324 F.2d 209 (7th Cir. 1963) cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); Downs v. Board of Education, 336 F.2d 988 (10th Cir. 1964) cert. den. 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965). It was held in *Bell, supra,* that segregation resulting from housing patterns did not require correction. It would seem then that even with the concededly affirmative duty to integrate, the standard is still one of reasonableness. If the drawing of district lines is reasonable and not intended to foster segregation then that action satisfies the mandate of *Brown.* It cannot be said that school district lines based on municipal boundaries are unreasonable.

Plaintiffs also rest their cause upon 42 U.S.C. § 1983 which provides as follows:

"*§ 1983. Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State * * *, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The complaint in the present action fails to contain allegations from which a violation of 42 U.S.C. § 1983 may be inferred. The court in Flemming v. Adams, 377 F.2d 975 (10th Cir. 1967) cert. den. 389 U.S. 898, 88 S.Ct. 219, 19 L.Ed.2d 216 (1967), relying on its opinion in Stringer v. Dilger, 313 F.2d 536 (10th Cir. 1963) stated:

"This court, in Stringer v. Dilger, * * * stated the statutory prerequisites for liability under § 1983 to be that the defendant must have acted 'under color of' state or local law, and the plaintiff must have been deprived of constitutional rights, privileges, or immunities. The first statutory prerequisite has been satisfied in the case at bar, for the appellees are state officials and employees who acted under authority of Colorado statutes. The appellees here do not contend otherwise. However, the second prerequisite under the statute, deprivation of a constitutional right, has not been met." [377 F.2d at p. 977]

*Flemming, supra,* affirmed the district court in Flemming v. Adams, 253 F. Supp. 549 (D.C.Colo.1966), in dismissing the complaint for failure of the plaintiff "to show a deprivation of any constitutional rights because the right to an education is not guaranteed under the federal constitution."

In our view the complaint in the action before us fails to state a claim upon which relief can be granted and thereby violates F.R.C.P. 12(b) (4). We would therefore dismiss the complaint.

The foregoing was drafted in advance of the decisions in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and its related cases by the Supreme Court. *Swann, supra,* fully supports this Court's disposition of plaintiffs' claims. The incisiveness of that opinion convinces the court that it should be briefly abstracted herein since we consider it to be favorable appellate review of our views heretofore expressed.

The decision in *Brown I* has been followed by numerous cases attempting to effect the mandate of *Brown* that school authorities immediately desegregate and

form a unitary school system. *Swann* is the most recent and hopefully last in a long line of such cases, for it deals quite specifically with the *duty* of school authorities to eliminate racially separate schools maintained by state action, and moreover the powers of federal courts to order such measures as are necessary to effect complete desegregation, *now*.

The Court in *Swann* draws a critical distinction between those states which have a history of dual school systems and a separation of the races which has continued through "freedom-of-choice" and "geographical zoning" plans which create the illusion of conforming to law, and those wherein so-called "de-facto" segregation results from housing patterns and conventional drawing of school district zones.

In focusing on the latter situation, which exists here, the following quotations from *Swann, supra,* are illuminating:

"This case and those argued with it arose in states having a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race." [at p. 5, 91 S.Ct. at p. 1271]

"Nearly 17 years ago this Court held, in explicit terms, that state-imposed segregation by race in public schools denies equal protection of the laws." [at p. 11, 91 S.Ct. at p. 1274]

"*Green* [held] that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a *unitary system* in which racial discrimination would be eliminated root and branch.'" [at p. 15, 91 S.Ct. at p. 1275]. [emphasis added]

"Section 2000c(b) [42 U.S.C.] defines 'desegregation' as it is used in Title IV:

"'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but '*desegregation*' shall not mean the assignment of students to public schools in order to *overcome racial imbalance*."

"Section 2000c-6, authorizing the Attorney General to institute federal suits contains the following proviso: 'nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a *racial balance* in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards.'

* * * The legislative history of Title IV indicates that Congress was concerned that the Act might be read as creating a right of action under the Fourteenth Amendment in *the situation of so-called 'de facto segregation'*, where racial imbalance exists in the schools but with no showing that this was brought about by discriminatory action of state authorities." [at p. 17, 91 S. Ct. at p. 1277] [emphasis added]

The conditions complained of herein are precisely those considered by the Court in *Swann* to be "de facto segregation", defined as racial imbalance that exists through no discriminatory action of state authorities. The New Jersey statutes upon which this constitutional attack is made were enacted by the legislature in 1953, Chapter 417, Laws of 1953, effective July 1, 1954 and known *inter alia* as, An Act concerning the creation of new school districts * * *. The creation of these school districts by approval of the legislature on September 18, 1953, preceded the historic decision of *Brown I*, decided on May 17, 1954. The obvious intent of the legislature was to maintain a unitary school system as *Brown I* later required. While the result of such legislation some 18 years later may be racial imbalance, within

certain school districts, it does not amount to segregation.

▉ The above cited portions of *Swann* conclusively demonstrate that a federal court is precluded, by Title IV of the Civil Rights Act of 1964, 42 U.S. C. § 2000c, and also by the unanimous opinion of the Supreme Court, from imposing upon school authorities the affirmative duty to cure racial imbalance in the situation of "de facto" segregation described herein.

▉▉ A continuing trend toward racial imbalance caused by housing patterns within the various school districts is not susceptible to federal judicial intervention. The New Jersey Legislature has by intent maintained a unitary system of public education, albeit that system has degenerated to extreme racial imbalance in some school districts; nevertheless the statutes in question as they are presently constituted are constitutional.

Accordingly the complaint should be dismissed. An appropriate Order may be submitted.