Charles F. STARR et al.

v.

H. Emslie PARKS et al.

Civ. A. No. 72–73–N.

United States District Court, D. Maryland.

June 2, 1972.

Leonard J. Kerpelman, Baltimore, Md. for plaintiffs.

Thomas J. Wohlgemuth, Annapolis, Md., for defendants, Board of Education of Anne Arundel County and Mrs. Edwin Zinneman.

R. Bruce Alderman, Baltimore County Sol., Eugene G. Ricks and Thomas J. Aversa, Jr., Asst. County Sols., for de-

fendants, Board of Education of Baltimore County.

Charles A. Reese, Ellicott City, Md., for defendants, Board of Education of Howard County.

George L. Russell, Jr., City Sol. of Baltimore, Ambrose T. Hartman, Deputy City Sol., Howard E. Wallin, Asst. City Sol., for defendants, Board of School Commissioners of Baltimore City.

Francis B. Burch, Atty. Gen. of Maryland, E. Stephen Derby and Malcolm R. Kitt, Asst. Attys. Gen. of Maryland, for defendants, Maryland State Board of Education and Dr. James A. Sensenbaugh, Superintendent of Education.

NORTHROP Chief Judge.

## FACTS

All of the plaintiffs in this case are white parents residing in the City of Baltimore who have children attending the public schools of the said City. The plaintiffs attack the racial composition of the schools in the Baltimore Metropolitan area through the vehicle of a constitutional challenge to several portions of the Maryland Constitution and of the Annotated Code, relating to municipal boundaries and to public education. As best we can understand the gravamen of the action from the plaintiffs' amended complaint the all-white plaintiffs have become disenchanted with the fact that most City schools are now, by dint of a process of re-segregation mostly black; this, they say is a situation extant because of various state laws governing the responsibility of municipalities for education, and this they say, violates their constitutional rights. In short the relief which plaintiffs seek is *not* the relief customarily sought in school desegregation cases, that is, the establishment of a system which establishes equal educational opportunities for blacks once the victims of de jure segregation. Indeed, plaintiffs seem to be contending, in their memorandum, at least that the open-door policies of the Baltimore City schools in an effort to comply with federal court decisions in the integration

area from *Brown* v. *Board* on down, have resulted in a system overloaded with blacks, which the plaintiffs now want to escape. The way in which they seek to escape the results of desegregation is to have this court enroll their children in the mostly-white schools of neighboring Baltimore Anne Arundel, and Howard Counties. The way in which the Court is supposed to go about this enrollment process is to strike down as unconstitutional certain state statutes and Constitutional provisions which, first, establish the boundaries of the various municipalities here involved and, second, establish the municipalities as more-or-less autonomous school district. Plaintiffs do not seek, and are indeed opposed to the consolidation of the school systems in the municipal area in such fashion that bussing would become necessary to establish and/or maintain a certain black/white ratio of student population in all municipal area schools. Rather, they want a sort of open door policy established under which a student could attend any municipal school of his choice, provided he got there under his own steam. Assumedly, the racial mix in the schools would then be left to its own devices, much like water, to seek its own level. It bears notice at the outset that the amended complaint asks relief only insofar as schools "at or near the boundary lines of Baltimore City" are concerned.

## THREE-JUDGE COURT

The plaintiffs' case alleges that the various defendant school boards are adhering to "an exclusionary policy" *based upon* certain statutes of the State of Maryland which were specified in the petition to amend the complaint. These statutes are:

*Maryland Constitution*, Art. 25A, which is nonexistent. We must assume that plaintiffs are attacking Art. 13 § 1, which provides for the creation of new counties and sets forth the process, requiring a referendum, for the alteration of the boundary lines

of Baltimore City and of the various counties;

Code, Art. 25A, which relates to the procedure whereby existing counties may achieve "home rule"; and

Code, Art. 77, §§ 1, 2, 7, 8, 11, 15, 22–24, 28, 34, 35, 37–42, 142 and 143, which establish and set forth the duties of the State, County and the City Boards of School Commissioners, respectively. These statutes are attacked "Particularly [as to] those portions . . . which give authority to set boundaries and/or exclude pupils directly or by implication."

█ It is clear that the statute governing the convention of three-judge courts is to be strictly construed, as the Supreme Court has reminded us many times. See, e. g., Board of Regents v. New Left Education Project, 404 U.S 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972); Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800 (1941). In this light, let us turn to plaintiffs' request for a three-judge court, as amended.

█ It should be noted that the amended complaint asks that this case initially be assigned to a district judge chosen by plaintiffs and attacks the random assignment method used in this District, which according to plaintiffs, violates their due process rights. But the point is that our "arbitrary" policy of random case assignment is adhered to in the interests of justice and fairness to litigants and is an effort to put justice in the abstract, as far as possible, removed from personalities. Even a layman could or should realize that our policy is one of protection, rather than of discrimination. Therefore, leave to choose the judge to whom the case is assigned is denied.

█ As to the request for a three-judge court, it is clear that under 28 U.S.C. § 2281 a three-judge court is required to be convened where the plaintiff requests injunctive relief against the application by a state officer of a state statute on the basis of the unconstitutionality of that statute. Although there are state statutes involved in this case, the plaintiffs, in the original complaint sued no state officers, but sued merely school board members who are not, under the laws of Maryland state officers. Board of County School Commissioners v. Goldsborough, 90 Md. 193, 44 A. 1055 (1899). Nevertheless since plaintiffs amended their complaint to join state officers, we shall treat the case as if it were one in which a state officer enforcing a state statute, or a local officer enforcing a state statute of more than local concern, was sued for injunctive relief. Cf., Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935). In such a case, even though the complaint seeks injunctive relief against the operation of a state statute, the complaint may be dismissed by a single judge if the claim as to the unconstitutionality of the statute, or statutes involved is "essentially fictitious." Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). In such a case, although the plaintiffs might be asserting a valid federal question claim, in that their cause of action arises under the Constitution of the United States, the fault is not at all with the statutes under attack, but with the actions of state officers which actions are not the result of the facial or applied unconstitutionality of any state statute; in such a case, the only statute really under attack is the enabling statute from which the officers draw their powers under state law, and it has been clear ever since Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941) that, in such a case a three-judge court is not required to be convened. In other words, where as here the claim is that the defendants are administering a constitutional statute in an unconstitutional manner, no three-judge court is required, Phillips, supra, and, it follows, a single District Judge may dismiss the complaint if such dismissal is warranted under the facts. Of course,

this assumes the facial constitutionality of the statutes involved but the single judge must have the power to make this threshold inquiry, or else the language in *Phillips* and Bailey v. Patterson, *supra* is meaningless. Thus, let us turn to the statutes brought in by plaintiffs in the petition to amend.

■ First we have the Constitutional provision, Art. 13 § 1, relating to the method to be used for a boundary change in the boundaries of any of the Counties or in the City of Baltimore. Quite obviously, since the plaintiff could derive the relief he seeks without a formal change of the boundaries of the City of Baltimore or of the Counties, the Constitutionality *vel non* of this provision is not even in issue in the case. But if it were, it is clear that the provision is perfectly constitutional. I can think of no area of state sovereignty so far removed from control by the Federal Constitution than the right of the state to set the boundaries of its political subdivisions and to select the process by which the people affected are to have a say in the re-alignment of their boundaries. Although it is true that Federal Courts in certain cases, among which are included voting rights cases, may disregard local boundaries when exercising their powers of granting equitable relief, it is equally true that no court will strike down completely the boundary of a political subdivision or the procedure for establishing the same. Indeed, even Judge Mehrige did not purport to disestablish or alter the boundaries of the City of Richmond or of Henrico or Chesterfield Counties in his decision in *Bradley* v. *Board,* about which much more will be said later. The same rationale applies of course, to the section challenged in the Rules of Interpretation Article of the *Code, viz.,* Art. 1 § 12, and it applies even more strongly for the reasons stated when we first mentioned the statute and also for the reason that it is impossible to perceive what possible relevance a rule of interpretation bears to the issues in the instant case.

Next, plaintiffs challenge Art. 25A of the Code, which sets up the procedure whereby counties may achieve "home rule." The Court can see absolutely no possible way in which this statute could be unconstitutional.

With respect to the statutes which set out and define the compositions, powers and duties of the school boards of the City and of the various counties (Art. 77 §§ 1, 2, 7, 8, 11, 15, 22–24, 34, 35, 37–42, 142 and 143), it is quite obvious that these statutes are perfectly constitutional enabling statutes dating back to the General Education Act of 1872. Acts of 1872, ch. 377. In fact, a close reading of the statutes challenged here in comparison to their progenitors of 1872 discloses only minimal changes in the interest of modernity. These statutes set out a framework of the public educational system of the State, giving the boards of education in the various counties and the City of Baltimore more or less complete control over the establishment and maintenance of a system of public instruction within their respective jurisdictions. *Nowhere* is there any statutory provision which purports to deny the various boards the power to accept students from neighboring, or, for that matter with respect to Howard County, from non-contiguous counties or cities. In fact, these statutes are just as innocuous as the statutes which the Supreme Court indicated were not challengeable in a three-judge court action in the *Phillips* case, *supra.* Consequently, the issue put by the plaintiffs relating to the unconstitutionality of the statutes enumerated is in our judgment "essentially fictitious," and, hence, a three-judge court is not mandated. Bailey v. Patterson, *supra.*

Indeed, plaintiffs "put the frosting on the cake" in the prayer for convening a three-judge court in their amended complaint, wherein it is explicitly stated that the constitutional provisions and statutes are *not* attacked as being unconstitutional on their face. This disclaimer rein-

forces this Court's view that the prayer for a three-judge court must be denied.

■ There is another separate and independent ground for the denial of the three-judge court in this case. In the recent case of Board of Regents v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972), the Supreme Court clearly held that where the plaintiff attacks a policy of state officials (there the State Board of Regents of the University of Texas System), which policy has only local and not statewide ramifications, a three-judge court is not properly convened. Here, although the plaintiffs' original complaint made allegations of the statewide nature of the policy which the defendant school boards were pursuing, there is no indication that any area of the State other than the Baltimore Metropolitan area is involved in this case, and the situation is clearly made no different because state officers were joined as parties defendant in the amended complaint; either way, the situation under attack is a purely local one. We may notice that there are 23 counties and one City (Baltimore) making up the body politic of this State. Of these 24 subdivisions, only 4, or ⅙ are involved in the present litigation. Thus, the policies under attack, if indeed, they exist at all, must be deemed to be purely local as pertaining only to the Metropolitan Baltimore area and thus there is no three-judge court issue presented. Board of Regents, *supra*.

■ Finally, this Court agrees with the State in its assertion that this is a case in which in addition to the unsubstantiality of the constitutional claim, "injunctive relief is otherwise unavailable." Maryland Citizens for a Representative General Assembly v. Governor of Maryland, 429 F.2d 606, 611 (4th Cir. 1970). The injunctive relief is improper because the relief prayed does not really seek to stop anybody from enforcing anything; rather the plaintiffs seek to use the injunction as a vehicle for promulgating a plan of super-districting. Consequently, and for all the reasons I have set forth hereinabove, the plaintiffs'

request for a three-judge court is denied. *See* Maryland Citizens v. Governor, *supra;* Britton v. Bullen, 275 F.Supp. 756, 759–760 (D.Md.1967).

## DEFENDANTS' RULE 12(b) (6) MOTIONS

*Failure to State a Claim upon which Relief can be Granted.*

■ The defendants have moved to dismiss the amended complaint on the ground that it does not state a claim upon which relief can be granted. Fed.R. Civ.P. 12(b) (6). Of course, such dismissal must be granted if the Court determines that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). I think that the amended complaint in this case, construing the allegations as favorably as possible towards plaintiffs, fails to state a claim under which relief can be granted within the civil rights statutes, 42 U.S.C. § 1981 *et seq.*

The Court has carefully considered the amended complaint as well as the plaintiffs' memorandum and argument, and the cases cited, especially the New Jersey case, Spencer v. Kugler, 326 F. Supp. 1235 (D.N.J.1971), *aff'd,* 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972), and the Richmond case, Bradley v. School Board, D.C., 338 F.Supp. 67. In order to set our thoughts in proper perspective, the Court will first refer back to the plaintiffs' amended complaint and the memorandum submitted in opposition to these motions in order to glean some insight into just what the plaintiffs want the Court to do in this case.

■ It is stated that the plaintiffs are all parents of white school children, all of whom attend mostly black city schools. It is crystal-clear that the plaintiffs want this Court to hold unconstitutional the policy of the City and County School Boards (if indeed such policy exists, and we will assume it does

for the purposes of this motion) which effectively confines attendance at City and County schools to residents of the City and Counties, respectively. In other words, the plaintiffs seek to escape the re-segregation of city schools which has occurred in the wake of the integration of the city schools. If it is accepted that at one time the City of Baltimore maintained a dual school system, a species of de jure segregation, and if it is accepted that the City has effectively tried to wipe out the effects of that duality by effectively integrating city educational facilities, and if it is further accepted that because of the demography of the city and of the counties, that a majority of city schools are now all-or-mostly black, then what has occurred here is the process referred to in the cases, including the Richmond case, of resegregation. That is, the strange state of affairs in which integration has resulted in a situation where blacks have become the majority in formerly white institutions. Plaintiffs are upset with this process, and seek to escape the effects of integration by asking this court to allow their children to escape from the city schools which, in recent years, they say, have deteriorated rapidly in the aftermath of voluntary integration. As the plaintiffs point out with respect to City College in their memorandum:

> . . . [A] sorry example is Baltimore City College which in years gone by was also an outstanding institution of education in the public school realm. It produced large numbers of the present professional classes of the Baltimore metropolitan area, and it too had a national reputation.

> Self consciously, when integration began at this school, standards were dropped "so as to keep no one out." Everyone came in. Riffraff, ruffians, ne'er-do-wells, and trouble-makers, and everything was condoned. Baltimore City College as it once was is no more. Shootings have taken place in its halls. The school is filled to less than one-half capacity. Its educational reputation is in tatters. It has, in short, integrated, disintegrated, and it has now become resegregated.

So plaintiffs want to escape this disintegration by having this Court order the county schools to drop their policy of educating county residents, and admit without qualification the children of the white plaintiffs residing at or near the City line who seek to escape the city schools. But there is no indication of how the granting of relief to these plaintiffs would do anything *but* exacerbate the effects of re-segregation. In other words, plaintiffs, who are white, and thus, I think we may judicially notice, are less disadvantaged and more mobile than city blacks (and all the decisions stand for this principle, including the Richmond case) would transport themselves to the County schools. The question of how County students would be brought in to prevent further re-segregation of City schools is ignored, since plaintiffs are adamantly opposed to the institution of a bussing scheme. Indeed, plaintiffs say in their amended complaint that this suit would be immediately dismissed were bussing "proffered" by the Court. Likewise, without bussing, it is impossible for this Court to see how less mobile blacks would be transported to the County schools to lessen the effect of exacerbated re-segregation caused by the plaintiffs' children's flight to suburban schools. Thus, in asking the Court to allow the plaintiffs' children to go to County schools, but at the same time opposing bussing to stop the further segregation of City schools which would quite obviously result from granting plaintiffs the relief they seek, the plaintiffs have asked this Court to do something which is patently unconstitutional, that is, to further the separation of the races in the school systems of the City and of the surrounding Metropolitan counties. This we flatly refuse to do, and we cannot do it under the mandate of the Court in Swann v. Charlotte-Mecklenburg, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), wherein the Chief Justice reminded the District Courts that their duty is to make sure that where a

dual school system once existed in a particular political subdivision, the school authorities carry out their "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 91 S.Ct. at 1275. If this Court were to go along with the plaintiffs in this case, were to find that they have stated a cause of action upon which relief can be granted, the Court would be perpetuating and aggravating racial separation in the metropolitan school systems, since there is no conceivable way, short of molecular transferrance, that school populations could be stabilized in the Metropolitan area without bussing if the white plaintiffs were given carte blanche to flee the city school system. The Court refuses to be a party to the plaintiffs' attempt to trench upon the Constitutional rights of others, as decreed by the Court since *Brown* v. *Board of Education,* in order to remedy an imagined deprivation by the defendants of the plaintiffs' Constitutional rights.

It is interesting to note at this point that, apparently in response to arguments made at the initial hearing on these motions, plaintiffs in their amended complaint do not suggest that the entire city and county area be included in the new districting plan. Rather, plaintiffs would have this Court confine its attention to city and county schools and, a fortiori, without bussing, pupils located in a sort of DMZ "at or near the City line." Of course, this new twist does not add anything to plaintiffs' case. In fact, it raises yet another Constitutional impediment to this Court's granting the desired relief. We refer, of course, to the fact that serious equal protection questions would be raised by a scheme which pertains only to schools and pupils located near the boundary line. Suppose, for example, that a child from the Broadway and Orleans Street area of the City wished to go to Hereford High School near the Pennsylvania line? Or suppose, conversely, that a child from Annapolis wanted to go to Baltimore City College?

Could any such plan as posited by the plaintiffs be said to extend the equal protection of the laws to *all* metro-area children when it would deny these children the opportunities to attend their chosen schools, yet allow free transferability between, say, Northern High School and Towson High, or City College and Pikesville Senior High? The answer to the question is certainly no; if the relief sought by plaintiffs were to be granted, it would have to extend equally to all metro-area students, and such relief, as we have pointed out heretofore, could not be constitutionally granted without the use of bussing, which plaintiffs adamantly oppose. It appears that while plaintiffs attack vehemently racial disproportion in schools located near the City line, they are turning a blind eye upon racially disproportionate schools in the Center City or in the far reaches of the counties. Plaintiffs will not be allowed to pick and choose in such a fashion where, as here, their claim is predicated upon systemic disproportions.

■ Separate and apart from the fact that the Court cannot constitutionally grant the relief sought by the plaintiffs, and treating the amended complaint as if it asked for a consolidation, with transportation of students, of the school systems of Baltimore City and of the Metropolitan counties, by way of disregarding municipal boundaries as attendance criteria, the Court is convinced that such relief should not be granted, and cannot be granted in this situation since there is no violation of plaintiffs' Constitutional rights in the present Metropolitan situation  Since there is no possible violation of plaintiffs' Constitutional rights in the current separation of City and County school systems, the amended complaint must be dismissed for failure to state a claim upon which relief can be granted, for, as the Court said in *Swann, supra,* "judicial powers may be exercised only on the basis of a constitutional violation." 91 S.Ct. at 1276.

Indeed, as plaintiffs say in their memorandum, "This Court has the unre-

strained option of following either the New Jersey case . . . on the one hand . . . and the Richmond case [on the other]." We choose to follow the former, a case in which the Supreme Court has indicated at least its tacit approval by affirming without argument, rather than the yet untried-on-appeal decision of Judge Merhige, for the reason that we think the New Jersey case was correctly decided, and that the Richmond case is simply not applicable to the situation as it exists in the Baltimore area vis-a-vis a consolidated school district, with the bussing which such consolidation would of necessity entail.

In the New Jersey case of Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), aff'd, 404 U.S. 1027, 92 S.Ct. 707, 30 L. Ed.2d 723 (1972), the Court dismissed a complaint brought under the same jurisdictional statutes as the instant amended complaint (42 U.S.C. § 1981 *et seq.*) in which the plaintiffs, black citizens of New Jersey, complained that racial imbalance in schools of the various political subdivisions of New Jersey, caused by the New Jersey scheme which, like the Maryland scheme, sets up municipal boundaries as school district lines, violated the Constitutional rights of the plaintiffs. Let us point out that even though the plaintiffs here are not black, they probably do have standing to raise these questions, so there is no question of a dismissal for lack of standing. In the New Jersey case, the Court held that there was absolutely no violation of Constitutional rights of any of the plaintiffs because of the fact that school systems in the various political subdivisions of the state were granted independence and autonomy, apparently including the power of refusing pupil admittance to students of neighboring municipalities, under New Jersey Statutes (N.J.S.A. 18A:-8–1, 8–2) extremely similar to the Maryland Statutes pivotal in this action, Art. 77, §§ 34 and 142, which, as we have already pointed out, date back to the Acts of 1872, ch. 377. The *Spencer* court held that the complaint failed to state a claim upon which relief could be granted, and

thus dismissal was warranted under Rule 12(b) (6) in that no deprivation of a recognized Constitutional right had been pleaded. In reaching its conclusion, the *Spencer* court said the following:

It is clear that these legislative enactments prescribe school district boundaries in conformity with municipal boundaries. This designation of school district zones is therefore based on the geographic limitations of the various municipalities throughout the State. Nowhere in the drawing of school district lines are considerations of race, creed, color or national origin made. The setting of municipalities as local school districts is a reasonable standard especially in light of the municipal taxing authority. The system as provided by the various legislative enactments is unitary in nature and intent and any purported racial imbalance within a local school district results from an imbalance in the population of that municipality-school district. *Racially balanced municipalities are beyond the pale of either judicial or legislative intervention.*

Plaintiffs, in support of their allegations [that they do not enjoy the advantages of other public schools by reason of the racial disproportion of the pupils therein], have cited numerous judicial authorities among them, of course, *Brown, supra*, the landmark decision on the segregation issue . . [further citations omitted]. Those cases hold that a violation of 14th Amendment rights might result from a mere passive refusal to redistrict *unreasonable* boundaries. [citations omitted] It was held in [Bell v. School City of Gary, 213 F.Supp. 819 (N.D. Ind.1963), *aff'd*, 324 F.2d 209 (7th Cir. 1963), *cert. denied* 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964)] that segregation resulting from housing patterns did not require correction. It would seem then that even with the concededly affirmative duty to integrate, the standard is still one of reasonableness. If the drawing of district lines is reasonable and not in-

tended to foster segregation then that action satisfies the mandate of *Brown.* It cannot be said that school district lines based on municipal boundaries are unreasonable. 326 F.Supp. 1235, at 1240–41. [certain emphasis added].

I think the Court must agree that the ancient municipal boundary scheme in use in Maryland, which far predates the decision in *Brown,* and certainly predates any purported attempt on the part of anybody to evade that decision, is just as reasonable here as the New Jersey court found it to be. Incidentally, the New Jersey case was a three-judge case, and might properly have been one because it challenged a state of affairs prevailing throughout the state, which is not, as we have mentioned, the case here, insofar as the plaintiffs complain only about the Metropolitan Baltimore situation. Consequently, the Court in the instant case is constrained to agree with the New Jersey court and it hereby dismisses the amended complaint for failure to state a claim upon which relief can be granted. If there be segregation in the Metropolitan area, as the result of a process of "re-segregation", then the situation is surely one of de facto segregation, just as in Spencer v. Kugler, and the relief sought here is no more appropriate than that sought in the New Jersey case. *See* 326 F.Supp. 1235 at 1242–43.

The plaintiffs rely heavily upon the recent decision of Judge Robert R. Merhige, Jr. of the Eastern District of Virginia in the Richmond metro school case, Bradley v. School Board, 338 F.Supp. 67. This Court finds that the *Bradley* case is simply not applicable to the facts alleged in the instant case, even if that decision was correctly made.

First, as to the procedural posture of the case, it is noted that the Richmond City School Board united with the plaintiffs in seeking the judicial merger of the Richmond-Henrico-Chesterfield School Districts. *Bradley,* 338 F.Supp. at 113. In this case, the City has joined the County boards in seeking a dismissal of the complaint. Of course, the fact that the City might not like the idea of a merger does not in any way affect this Court's power to order the same, but it is a weighty consideration in our decision of whether to exercise our equitable powers in the fashion which plaintiffs request. *Cf. Swann, supra,* 91 S.Ct. at 1276, as to the equitable nature of the remedies to be given in school cases. But by far the most pervasive factor militating against the applicability of the Richmond decision to the Baltimore situation is the fact that in the Richmond Case Judge Merhige based his decision upon the history of *massive resistance* by the State Board of Education and other governmental agencies of the State of Virginia to compliance with the mandates of the Supreme Court in school cases from Brown v. Board on down to the present. 338 F.Supp. at 92–98 and *passim* in places too numerous to enumerate here. Indeed, most of Judge Merhige's several hundred pages of fact-findings relate to the well-known resistance of the State of Virginia to voluntary compliance with school desegregation orders from 1954 to 1971. By far the most convincing passage in the prolix opinion of Judge Merhige vis-a-vis the situation in Baltimore and the State of Maryland as a whole is the following, "[P]ast events in the metropolitan area and in Virginia betoken a willingness— indeed an enthusiam—to disregard political boundaries when needful to serve state educational policies, among them racial segregation." 338 F.Supp. at 103. upon this conclusion rests Judge Merhige's whole construction of a consolidated school district. Indeed, this court may take notice of the fact that there has been in the Baltimore Metropolitan area nowhere near the massive resistance, if indeed any resistance there has been at all, to the desegregation of schools, and the same is true of the State of Maryland as a whole. For example, in Virginia, there have been numerous instances of state-fostered and supported acts of evasion in the area of resistance to integration, which have not

been present here in Maryland as we strove to comply with *Brown* and its progeny. These factors present in Virginia include: the closing of school entirely in a county to avoid integration; the transportation of students to other political subdivisions to avoid integration (*see* 338 F.Supp. at 83); and, most interestingly, the use of tuition grants and scholarships "made available to any student desiring to escape desegregation in his home school division, [thus giving him] a ready refuge in a public segregated school system . . . [an] escape route [which] was beyond the power of the localities to bar." 338 F.Supp. at 95. The quoted sentence in and of itself speaks volumes upon the lack of this Court's power to grant plaintiffs here the relief they seek, for if Judge Merhige found that the escape was a state-fostered means of continuing segregation, or at the least of avoiding integration, by what right can this Court foster the same sort of unconstitutional practice? Is the practice any more right because ordered by a federal court than if engaged in by a state, when its effect is to thwart efforts at integration? Of course not, and thus the amended complaint herein fails to state a cause of action upon which the Court could possibly grant relief.

There are, of course, many, many more distinguishing factors in the Richmond case which make it poor precedent for the instant case, but I can see no purpose in detailing all of these distinctions here.

■ One, however, does merit especial mention, and that is the fact that under both the 1902 and 1971 Constitutions of Virginia, and under the legislative enactment pursuant thereto, Virginia's State Board of Education has long had the power to order the consolidation into one school division of the school divisions of two or more municipalities. Virginia Constitution [1902], § 133; Virginia Constitution [1971], Art. VIII, § 5(a); Va.Code Ann. § 22–30. Judge Merhige found that the State Board, as a part of its commitment

to resistance toward integration, had *refused* to exercise its state-law powers to order a remedial consolidation in the Richmond Metropolitan area. *Bradley,* 338 F.Supp. at 83–84, 90, 92, 98–100. Thus, Judge Merhige, in view of this failure of the State to act in furtherance of the State's discriminatory policies of the past, exercised the State Board's powers for it and created the Consolidated Richmond-Henrico-Chesterfield school division. It is quite clear that in Maryland, under Art. 77, the State Board of Education has no such power to consolidate school districts, and this goes back again to 1872. In fact, the only provision in the Maryland Code for consolidated schools, and even this does not relate to the consolidation of school *districts*, is § 52 pertaining to the joint operation of schools on or near the line of two counties. From the plain language of the statute, it appears that § 52 is not applicable to schools contiguous to the City of Baltimore, which is not one of the 23 counties of Maryland. Indeed, this would seem the natural interpretation of the word "county" as it appears generally in Article 77. *See* the opinion of the Attorney General written to Delegate Robey, dated January 6, 1972. If plaintiffs seek a construction of this statute in the light of basing their claim for relief thereon, they are clearly in the wrong court, since no Constitutional issue would be raised thereby. In any event, this Court would abstain from giving an authoritative interpretation to the statute insofar as there is plainly adequate state judicial relief available for this purpose. *See* Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L. Ed.2d 196; Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). Thus, there is no obstinate failure of the State to act here as there was in Virginia; no failure to exercise available powers which the State had refrained from exercising in pursuance of an obvious and well-known policy of fostering segregation of the races, an unconstitutional end. Such is quite simply not the case here. Indeed, it

is interesting to note in this connection that Judge Merhige found that there was an "historic flexibility of political subdivisions in the state and in [the Richmond metropolitan] area in matters of pupil exchange." This conclusion again pointed Judge Merhige toward the granting of the Consolidation but the plaintiffs here would turn the world upside down, as it were, and argue that this Court should force upon Maryland a plan which would exacerbate any existing traces of segregation, or in the alternative, aggravate the situation obtaining because of re-segregation, and thus place her in violation of the Supreme Law of the Land. This, the Court will not do, and the relief prayed simply cannot be granted.

For all the reasons stated above, the amended complaint is dismissed with prejudice and with costs.