GUEY HEUNG LEE ET AL. *v.* JOHNSON ET AL.

No. A–203.   Decided August 25, 1971

See: 339 F. Supp. 1315.

Mr. Justice Douglas, Circuit Justice.

Applicants are Americans of Chinese ancestry, who seek a stay of a Federal District Court's order reassigning pupils of Chinese ancestry to elementary public schools in San Francisco. The order was made in a school desegregation case, the San Francisco Unified School District having submitted a comprehensive plan for desegregation which the District Court approved.

There are many minorities in the elementary schools of San Francisco; and while the opinion of the District Court mentions mostly the blacks, there are in addition to whites, Chinese, Japanese, Filipinos, and Americans both of African and Spanish ancestry. The schools attended by the class here represented are filled predominantly with children of Chinese ancestry—in one 456 out of 482, in another 230 out of 289, and in a third, 1,074 out of 1,111.

Historically, California statutorily provided for the establishment of separate schools for children of Chinese ancestry.* That was the classic case of *de jure* segrega-

---

*Until 1947, the California Education Code provided:

"§ 8003. *Schools for Indian children, and children of Chinese, Japanese, or Mongolian parentage: Establishment.* The governing board of any school district may establish separate schools for

tion involved in *Brown* v. *Board of Education,* 347 U. S. 483, relief ordered, 349 U. S. 294. Schools once segregated by state action must be desegregated by state action, at least until the force of the earlier segregation policy has been dissipated. "The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation." *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15. The District Court in the present case made findings that plainly indicate the force of the old policy has persisted: "[T]he school board . . . has drawn school attendance lines, year after year, knowing that the lines maintain or heighten racial imbalance . . . ." And further, that no evidence has been tendered to show that since *Brown I* "the San Francisco school authorities had ever changed any school attendance line for the purpose of reducing or eliminating racial imbalance." *Johnson* v. *San Francisco Unified School District,* 339 F. Supp. 1315, 1318–1319 (ND Cal. 1971).

*Brown* v. *Board of Education* was not written for blacks alone. It rests on the Equal Protection Clause of the Fourteenth Amendment, one of the first beneficiaries of which were the Chinese people of San Francisco. See *Yick Wo* v. *Hopkins,* 118 U. S. 356. The theme of our school desegregation cases extends to all

Indian children, excepting children of Indians who are wards of the United States Government and children of all other Indians who are descendants of the original American Indians of the United States, and for children of Chinese, Japanese, or Mongolian parentage.

"§ 8004. *Same: Admission of children into other schools.* When separate schools are established for Indian children or children of Chinese, Japanese, or Mongolian parentage, the Indian children or children of Chinese, Japanese, or Mongolian parentage shall not be admitted into any other school."

These provisions were eventually repealed. 1947 Cal. Stats., c. 737, § 1.

racial minorities treated invidiously by a State or any of its agencies.

It is not for me to approve or disapprove the plan; that is a matter that goes to the merits and the appeal has not been heard. The plan, however, has earmarks of a thoughtful plan, at least measured by some of the thoughtful concerns of the Chinese community. The District Court ruled:

"Bi-lingual classes are not proscribed. They may be provided in any manner which does not create, maintain or foster segregation.

"There is no prohibition of courses teaching the cultural background and heritages of various racial and ethnic groups. While such courses may have particular appeal to members of the particular racial or ethnic group whose background and heritage is being studied, it would seem to be highly desirable that this understanding be shared with those of other racial and ethnic backgrounds." 339 F. Supp., at 1322.

And the District Court concluded:

"The Judgment and Decree now to be entered is of less consequence than the spirit of community response. In the end, that response may well be decisive in determining whether San Francisco is to be divided into hostile racial camps, breeding greater violence in the streets, or is to become a more unified city demonstrating its historic capacity for diversity without disunity.

"The school children of San Francisco can be counted upon to lead the way to unity. In this and in their capacity to accept change without anger, they deserve no less than the whole-hearted support of all their elders." 339 F. Supp., at 1323.

The decree has been strenuously opposed. Upon application by applicants, the Court of Appeals for the Ninth Circuit entered a temporary stay pending a hearing in the District Court. Four days later, however, the Court of Appeals vacated that stay *sua sponte*. The District Court then denied the stay. Thereupon a different three-judge panel of the Court of Appeals heard oral argument on the motions for a stay and denied those motions.

I see no reason to take contrary action. So far as the overriding questions of law are concerned the decision of the District Court seems well within bounds. See *Keyes* v. *Denver School District,* 396 U. S. 1215 (BRENNAN, J., in chambers). It would take some intervening event or some novel question of law to induce me as Circuit Justice to overrule the considered action of my Brethren of the Ninth Circuit.

*Application for stay denied.*