Kinney Kinmon LAU, a Minor by and through Mrs. Kam Wai Lau, his Guardian ad Litem et al., Plaintiffs-Appellants.

v.

Alan H. NICHOLS, President et al., Defendants-Appellees.*

No. 26155.

United States Court of Appeals, Ninth Circuit.

Jan. 8, 1973.

Rehearing En Banc Denied June 18, 1973.

Hufstedler, Circuit Judge, with whom Ely, J., concurred, filed an opinion dissenting from the rejection of an en banc consideration.

Trask, Circuit Judge, with whom Wright, J., concurred, filed opinion concurring in the rejection of the en banc consideration.

---

* The original opinion and dissent published in the Federal Reporter Advance Sheets, Second Series at 472 F.2d 909 was withdrawn from publication in the bound volume pending completion of en banc proceedings. That opinion and dissent together with completed en banc proceedings as now published represent the final action of the court.

Edward H. Steinman (argued), of Youth Law Center, San Francisco, Cal., for plaintiffs-appellants.

Marian Wright Edelman, Director, Roger L. Rice, Staff Atty., Center for Law and Education, Harvard University, Cambridge, Mass., amicus curiae for plaintiffs-appellants.

Thomas M. O'Conner, City Atty. (argued), Raymond D. Williamson, Deputy City Atty., San Francisco, Cal., for defendants-appellees.

John D. Leshy, Atty. (argued), James L. Browning, U. S. Atty., San Francisco, Cal., David D. Gregory, Joseph B. Scott, Brian K. Landsberg, Attys., David L. Norman, Deputy Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Jerris Leonard, Asst. Atty. Gen., Washington, D. C., amicus curiae for appellee.

Marian Wright Edelman, Director, Roger L. Rice, Staff Atty., Cambridge, Mass., amicus curiae for the appellant.

Before CHAMBERS and TRASK, Circuit Judges, and HILL,** District Judge.

TRASK, Circuit Judge:

This appeal is from the district court's adverse disposition of a civil rights class action filed by appellants to compel the San Francisco Unified School District to provide all non-English-speaking Chinese students attending District schools with bilingual compensatory education in the English language. The defendants-appellees are the superintendent and members of the Board of Education of the School District, and members of the Board of Supervisors of the City and County of San Francisco.

Two classes of non-English-speaking Chinese pupils are represented in this action. The first class, composed of 1,790 of the 2,856 Chinese-speaking students in the District who admittedly need special instruction in English, receive no such help at all. The second class of 1,066 Chinese-speaking students receive compensatory education, 633 on a

** Honorable Irving Hill, United States District Judge for the Central District of California, sitting by designation.

part-time (one hour per day) basis, and 433 on a full-time (six hours per day) basis. Little more than one-third of the 59 teachers involved in providing this special instruction are fluent in both English and Chinese, and both bilingual and English-as-a-Second Language (ESL) methods are used. As of September 1969, there were approximately 100,000 students attending District schools, of which 16,574 were Chinese.[1]

Appellants' complaint states seven causes of action, alleging violations of the United States Constitution, the California Constitution,[2] Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and provisions of the California Education Code. Essentially, appellants contend that appellees have abridged their rights to an education and to bilingual education, and disregarded their rights to equal educational opportunity among themselves and with English-speaking students. They pray for declaratory judgment and for preliminary and permanent injunctive relief mandating bilingual compensatory education in English for all non-English-speaking Chinese students.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), and 1343 (civil rights). This court's jurisdiction arises under 28 U.S. C. § 1291, as the district court's order finding for appellees on the merits was a final order.[3]

■ As hereinbefore stated, the district court denied appellants all relief, and found for appellees on the merits. The court expressed well-founded sympathy for the plight of the students represented in this action, but concluded that their rights to an education and to equal educational opportunities had been satisfied, in that they received "the same education made available on the same terms and conditions to the other tens of thousands of students in the San Francisco Unified School District . . . ." Appellees had no duty to rectify appellants' special deficiencies, as long as they provided these students with access to the same educational system made available to all other students.[4]

---

1. The parties stipulated:
   "1. There are—at present—2,856 Chinese-speaking students in the San Francisco Unified School District who need special instruction in English.
   . . .

   a. Of these 2,856 Chinese-speaking students who need special help in English, 1,066 receive some help . . . .

   b. Of the 1,066 Chinese-speaking students receiving help, 633 receive such help on a part-time basis and 433 on a full-time basis. . . .
   "2. In November of 1967, there were 2,455 Chinese-speaking students in the San Francisco Unified School District who needed special instruction in English . . . . Of these 2,455 Chinese-speaking students needing special help, 473 received such help . . . .
   "3. According to the annual reports of the Human Relations Division of the San Francisco Unified School District, the following represents the number of Chinese students in the San Francisco Unified School District in the years 1966–1969:
   15,642 Chinese students—October, 1966
   15,559 Chinese students—October, 1967

   16,091 Chinese students—September, 1968
   16,574 Chinese students—September, 1969."
   These statistics were provided by the parties to the district court in the first half of 1970. We have been given no reason to think that they no longer adequately reflect the relative dimensions of the problem the School District faces in attempting to provide quality education for all its students.

2. The right to an education is claimed under the Fifth (Due Process), Ninth (Reserved Powers), and Fourteenth (Equal Protection Clause) Amendments to the Constitution of the United States; and under Article IX, Section 5 of the Constitution of the State of California (Provision for system of common schools.)

3. Order p. 3 . C.T. at 420.

4. Appellees challenge the employment of a class action in this case. Although the district court did not explicitly rule on this issue, its denial of appellees' motion to dismiss, and decision on the merits implicitly determined that the class action was proper. We agree. Fed.R.Civ.P. 23.

In appealing this case, appellants argue[5] that the district court misconstrued the meaning of the mandate of Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954), that education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." In *Brown,* appellants continue, "equal terms" meant without segregation imposed by law, because even though there was "surface equality," it "caused . . . a sense of inferiority in minority children which affected their ability and motivation to learn and tended to retard their educational and mental growth." Brief for Appellants at 21.

As applied to the facts of this case, appellants reason, *Brown* mandates consideration of the student's responses to the teaching provided by his school in determining whether he has been afforded equal educational opportunity. Even though the student is given the same course of instruction as all other school children, he is denied education on "equal terms" with them if he cannot understand the language of instruction and is, therefore, unable to take as great an advantage of his classes as other students. According to appellants, *Brown* requires schools to provide "equal" opportunities to all, and equality is to be measured not only by what the school offers the child, but by the potential which the child brings to the school. If the student is disadvantaged with respect to his classmates, the school has an affirmative duty to provide him special assistance to overcome his disabilities, whatever the origin of those disabilities may be.

Appellants' reading of *Brown* is extreme, and one which we cannot accept. There, the Court held that legally constituted and enforced dual school systems were unconstitutional as a denial of equal protection; that state-maintained "separate but equal" educational facilities, sanctioned by Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L. Ed. 256 (1886), were no longer to be allowed. *Brown* concerned affirmative state action discriminating against persons because of their race. Swann v. Board of Education, 402 U.S. 1, 5, 91 S. Ct. 1267, 28 L.Ed.2d 554 (1971). It struck down the denial of admission of black children to schools attended by white children under laws requiring or permitting segregation according to race. Brown v. Board of Education, 347 U.S. at 488, 74 S.Ct. 686, 98 L.Ed. 873. It followed the dictate of the Fourteenth Amendment, that "[n]o *State* shall . . . *deny* to any person . . . the equal protection of the laws." U.S. Const. Amend. XIV, § 1 (emphasis supplied). Therefore, under *Brown,* cases of de jure, as contrasted with de facto, discrimination violate the constitutional command.[6] Other cases have followed the same rationale, Gomperts v. Chase, 329 F.Supp. 1192, 1195 (N.D.Cal.1971), application for injunction pending filing of petition for writ of certiorari denied,

---

5. The amicus curiae briefs filed by the United States and the Center for Law and Education, Harvard University (Center) in support of appellants, which have been of great assistance to this court in reaching its decision, raise basically the same arguments as appellants.

6. Relying upon the third party beneficiary rationale of Lemon v. School Board, 240 F.Supp. 709, 713 (W.D.La.1965), aff'd, 370 F.2d 847 (5th Cir.), cert. denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967), appellants also charge that appellees have violated Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

It is noted that Section 601 requires affirmative action by which a person is "excluded" from participation, "denied" the benefits, and "subjected" to discrimination.

Our determination of the merits of the other claims of appellants will likewise dispose of the claims made under the Civil Rights Act.

404 U.S. 1237, 92 S.Ct. 16, 30 L.Ed.2d 30 (1971) ; *see* Swann v. Board of Education, *supra*, 402 U.S. at 15–18, 91 S.Ct. 1267; Kelly v. Guinn, 456 F.2d 100, 105 (9th Cir. 1972); Keyes v. School District No. 1, 445 F.2d 990, 999 (10th Cir. 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972) ; Davis v. School District, 443 F.2d 573, 575 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971) ; Deal v. Board of Education, 419 F.2d 1387, 1388 (6th Cir. 1969), cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971), and 369 F.2d 55, 62 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S. Ct. 39, 19 L.Ed.2d 114 (1967) ; Johnson v. School District, 339 F.Supp. 1315 (N. D.Cal.1971), application for stay pending appeal denied sub nom. Guey Heung Lee v. Johnson, 404 U.S. 1215, 92 S.Ct. 14, 30 L.Ed.2d 19 (1971) ;[7] Spencer v. Kugler, 326 F.Supp. 1235, 1239, 1241–1242 (D.N.J.1971), aff'd mem., 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972) ; Cisneros v. School District, 324 F.Supp. 599, 616–20 (S.D.Tex.1970), supplemented by 330 F.Supp. 1377, application for reinstatement of stay granted, 404 U.S. 1211, 92 S.Ct. 9, 30 L. Ed.2d 15 (1971), aff'd in part, modified in part and remanded, 467 F.2d 142 (5th Cir. 1972) ; United States v. Texas, 321 F.Supp. 1043 (E.D.Tex.1970), supple-mented by 330 F.Supp. 235, aff'd, 447 F. 2d 441 (5th Cir. 1971), application for stay denied sub nom. Edgar v. United States, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed. 2d 10 (1971) cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972) ; Spangler v. Pasadena Board of Education, 311 F.Supp. 501 (C.D.Cal.1970).

The parameters of de jure segregation are still being explored by the courts.[8] If the neighborhood school system is ma· nipulated by the school board in such a way as to create, encourage or foster racial imbalance, courts have determined that a constitutional violation has occurred. *E. g.*, Gomperts v. Chase, *supra*. The courts have found de jure segregation where the school district has redrawn boundaries of existing schools so as to increase racial imbalance, by detaching compact, racially homogeneous neighborhoods from attendance zones for schools populated predominantly by members of another. race. *See, e. g.*, Keyes v. School District No. 1, *supra* at 445 F.2d 1000–1001; Davis v. School District, *supra* at 443 F.2d 574; Johnson v. School District, *supra* at 339 F. Supp. 1318, 1336–1337; United States v. Texas, *supra* at 321 F.Supp. 1049–1050; Cisneros v. School District, *supra* at 324 F.Supp. 617–618 ;[9] Spangler v. Board of Education, *supra* at 311 F.Supp. 507–510.

---

7. Oral argument of the appeals from the district court's judgment in this case, Nos. 71–1877–78, 71–2105, 71–2163, 71–2189, was heard before a panel of this court on January 14, 1972. Subsequently, Judge Madden, who was a member of the panel died, and Judge Browning was drawn by lot to replace him. By order of March 1, 1972, the panel vacated the submission of the case, to be set for reargument after the Supreme Court's disposition of Keyes v. School District No. 1, 445 F.2d 990 (10th Cir. 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972).

8. Next term, the Supreme Court will hear Keyes v. School District No. 1, 445 F.2d 990 (10th Cir. 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972), which raises the issue if and when the imposition of a neighborhood school system upon racially segregated residential patterns violates the Constitution. The Court has affirmed without opinion the judgment of the United States District Court for the District of New Jersey holding that drawing of school district boundaries which results in racially identifiable schools because of demographic patterns within the district is not per se unconstitutional. Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), aff'd mem., 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed. 2d 15 (1972).

9. Cisneros v. School District, 324 F.Supp. 599, 604–08 (S.D.Tex.1970), supplemented by 330 F.Supp. 1377, application for reinstatement of stay granted, 404 U.S. 1211, 92 S.Ct. 9, 30 L.Ed.2d 15 (1971), aff'd in part, modified in part and remanded, 467 F.2d 142 (5th Cir. 1972), involves discrimination against Mexican-Americans, a readily identifiable ethnic-minority group the courts found were protected by the Equal Protection Clause.

Another indicium of de jure segregation is the selection of construction sites for and establishment of attendance boundaries of new schools. If this is done in such a way as to increase the racial imbalance in schools, as by marking zones which coincide with racial residential patterns, courts have detected a constitutional violation. *See, e. g.,* Kelly v. Guinn, *supra* at 456 F.2d 105–107; Keyes v. School District No. 1, *supra* at 445 F.2d 1000; Davis v. School District, *supra* at 443 F.2d 575; Johnson v. School District, *supra* at 339 F.Supp. 1318, 1337; Cisneros v. School District, *supra* at 324 F.Supp. 617–619; Spangler v. Board of Education, *supra* at 311 F. Supp. 517–518.

Similarly, if mobile units and additions are used to accommodate overcrowding in racially identifiable schools when the reassignment of students to schools populated predominantly by scholastics of another race would be feasible, de jure segregation has been perceived. *See, e. g.,* Keyes v. School District No. 1, *supra* at 443 F.2d 1000; Johnson v. School District, *supra* at 339 F.Supp. 1318–1319; Cisneros v. School District, *supra* at 324 F.Supp. 618–619; Spangler v. Board of Education, *supra* at 311 F.Supp. 518–519.

If the school district allows students to use transfers solely to move from minority to majority schools, courts have discerned a violation of the Constitution. *See, e. g.,* United States v. Texas, *supra* at 321 F.Supp. 1049; Cisneros v. School District, *supra* at 324 F.Supp. 619; Spangler v. Board of Education, *supra* at 311 F.Supp. 520–521.

School boards have likewise been charged with practicing de jure segregation if they hire and assign faculty on the basis of race, thereby creating racially identifiable schools. *See, e. g.,*

Kelly v. Guinn, *supra* at 456 F.2d 106–107; Johnson v. School District, *supra* at 339 F.Supp. 1318; Cisneros v. School District, *supra* at 324 F.Supp. 619–620; Spangler v. Board of Education, *supra* at 311 F.Supp. 513, 515.

Intra-class grouping, when it operates to separate students by race and without reference to ability, has been considered constitutionally infirm. *See, e. g.,* Spangler v. Board of Education, *supra* at 311 F.Supp. 519–520.[10]

And a state agency's failure to consolidate small school districts solely because each is populated by predominantly one and a different race was thought to contravene the constitutional mandate. See United States v. Texas, *supra* at 321 F.Supp. 1047–1048.

■ Appellants have neither alleged nor shown any such discriminatory actions by appellees. The evidence, that English is and has been uniformly used as the language of instruction in all district schools, does not evince the requisite discrimination in the maintenance of this otherwise proper policy.[11]

Neither can appellants invoke the teachings of cases like Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969); Griffin v. School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L. Ed. 1340 (1915); United States v. Logue, 344 F.2d 290 (5th Cir. 1965); Meredith v. Fair, 298 F.2d 696 (5th Cir. 1962); and Franklin v. Parker, 223 F. Supp. 724 (M.D.Ala.1963), aff'd as modified in other part, 331 F.2d 841 (5th Cir. 1964). In those cases, facially neutral policies were held unconstitutional not simply because the burdens they created fell most heavily upon Blacks, but be-

10. Separate instruction of lingually deficient pupils can violate the Equal Protection Clause. *See* Gonzales v. Sheely, 96 F.Supp. 1004 (D.Ariz.1951); Mendez v. School District, 64 F.Supp. 544 (S.D. Cal.1946), aff'd on other grounds, 161 F.2d 774 (9th Cir. 1947).

11. "The power of the state to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instructions in English, is not questioned." Meyer v. Nebraska, 262 U.S. 390, 402, 43 S.Ct. 625, 628, 67 L.Ed. 1042 (1923).

cause the states' actions perpetuated the ill effects of past de jure segregation.

Although in its amicus curiae brief the Center for Law and Education, Harvard University, portrays appellants as "members of an identifiable racial minority which has historically been discriminated against by state action in the area of education . . .," Brief at 28,[12] appellants have alleged no such past de jure segregation. More importantly, there is no showing that appellants' lingual deficiencies are at all related to any such past discrimination. This court, therefore, rejects the argument that appellees have an affirmative duty to provide language instruction to compensate for appellants' handicaps, because they are carry-overs from state-imposed segregation. *See* Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 30 L.Ed.2d 728 (1971). If there are *any* such remnants, that appellants' primary language is Chinese has not been shown to be one of them.

It is with this reasoning in mind that we consider, and distinguish, United States v. Texas, 342 F.Supp. 24 (E.D. Tex.1971), a case which was brought to our attention by the Center Brief at 35–37, and heavily relied upon by appellants during oral argument. To be sure, in that order the court mandated bilingual education for Mexican-American and Anglo-American students in the San Felipe-Del Rio Consolidated Independent School District. However, the basis for that order was the court's prior determination, 321 F.Supp. 1043 (1970), supplemented by 330 F.Supp. 235, aff'd, 447 F.2d 441 (5th Cir.), application for stay denied sub nom. Edgar v. United States, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972), that there had been de jure segregation. The purpose of the order was, therefore, to " 'eliminate discrimination root and branch,' Green v. New Kent County Board of Education, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and to create a unitary school system 'with no [Mexican] schools and no white schools but just schools.' " United States v. Texas, *supra* at 342 F.Supp. 27 (E.D.Tex.1971); *accord*, 321 F.Supp. at 1052. As we have discussed, *supra*, such a rationale for requiring compensatory bilingual instruction is not applicable under the facts of this case.

In that case the court relied heavily upon a study by Dr. Cardenas concluding that the inability of the Mexican-American students to benefit from the educational system resulted from characteristics called "cultural incompatibilities" and English language deficiencies. These ethnically-linked traits—"albeit combined with other factors such as poverty, malnutrition and the effects of past educational deprivation" combine to identify this group and have "elicited from many school boards" the different and often discriminatory treatment. The court's comprehensive remedial education plan included mandated programs to develop language skills in a secondary language "(English for many Mexican-American students, Spanish for Anglo students)" so that "neither English nor Spanish is presented as a more valued language." United States v. Texas, *supra* at 342 F.Supp. 26, 30.

Every student brings to the starting line of his educational career different advantages and disadvantages caused in part by social, economic and cultural background, created and continued completely apart from any contribution by the school system. That some of these may be impediments which can be overcome does not amount to a "denial" by the Board of educational opportunities within the meaning of the Fourteenth Amendment should the Board fail to give them special attention, this even though they are characteristic of a particular ethnic group. Before the Board may be found to unconstitutionally deny special remedial attention to such defi-

12. *See* Guey Heung Lee v. Johnson, 404 U.S. 1215, 92 S.Ct. 14, 30 L.Ed.2d 19 (1971).

ciencies there must first be found a constitutional duty to provide them.

However commendable and socially desirable it might be for the School District to provide special remedial educational programs to disadvantaged students in those areas, or to provide better clothing or food to enable them to more easily adjust themselves to their educational environment, we find no constitutional or statutory basis upon which we can mandate that these things be done.

Appellants also rely on cases which have held it unconstitutional for a State to condition access to the criminal system upon the payment of money. *E. g.* Mayer v. Chicago, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971); Williams v. Oklahoma City, 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1969); Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L. E.2d 811 (1963); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). *See also* Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971). Appellants reason that both criminal and education systems are products of State government to which appropriate persons must submit themselves.[13] And, just as the indigent convict cannot take proper advantage of the legal system available to him if he does not have a lawyer, or a sufficient record of his trial, or enough money to activate the review process or pay his fine, so the Chinese-speaking children in this case lost the benefits of the educational system because they cannot understand the language in which they are taught. Furthermore, the parallel continues, it is argued, in the fact that a convict's poverty is no more ascribable to the State than the language

deficiency of these non-English-speaking Chinese students.

These criminal cases are distinguishable, however, because the ability of a convict to pay a fine or a fee imposed by the state, or to pay a lawyer, has no relationship to the purposes for which the criminal judicial system exists. Wealth is irrelevant to the factual ·determination of guilt, and is extraneous to resolution of related legal disputes. *See* Mayer v. Chicago, *supra* at 404 U.S. 193, 196, 92 S.Ct. 410, 30 L.Ed.2d 372; Griffin v. Illinois, *supra* at 351 U.S. 17–18, 21–22, 76 S.Ct. 585. *See also* Tate v. Short, *supra* at 401 U.S. 399, 91 S.Ct. 668, 28 L.Ed.2d 130. In our case, on the other hand, the State's use of English as the language of instruction in its schools is intimately and properly related to the educational and socializing purposes for which public schools were established.[14] This is an English-speaking nation. Knowledge of English is required to become a naturalized United States citizen, 8 U.S.C. § 1423(1); likewise, California requires knowledge of the language for jury service, Cal.Code Civ.P. § 198(2), (3). Similarly, an appreciation of English is essential to an understanding of legislative and judicial proceedings, and of the laws of the State, Cal.Const. art. IV, § 24; Cal.Code Civ.P. § 185, and of the nation. Use of English in the schools has this firm foundation, while the requirement of money payments in the criminal system does not.

■ Because we find that the language deficiency suffered by appellants was not caused directly or indirectly by any State action, we agree with the judgment of the district court and distinguish this case from Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its progeny of de jure cases. Under the facts of this case, appellees' responsibility to appel-

---

13. All persons between the ages of six and sixteen are compelled to attend public schools or receive equivalent education. Cal.Educ.Code § 12101. *But see* Wiscon-

sin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

14. *See* note 11 *supra.*

lants under the Equal Protection Clause extends no further than to provide them with the same facilities, textbooks, teachers and curriculum as is provided to other children in the district.[15] There is no evidence that this duty has not been discharged.

■ Appellants further complain that appellees have denied them equal protection by providing such remedial instruction as is made available on an unequal basis. Members of the first class of appellants receive no special help in English, while members of the second class are given compensatory instruction, some on a part-time and some on a full-time basis, and some through bilingual teachers and some with the ESL method.[16]

Both in the de jure cases and in the de facto cases (*e. g.*, Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), the constitutional claim is predicated upon some form of State or governmental action, present or historical, which has created a classification asserted to be invidious and thus violative of the Fourteenth Amendment. The State has enacted laws creating separate schools based upon race, Brown v. Board of Education, *supra*, the State has passed laws for school financing favoring students in wealthy tax-base districts, Serrano v. Priest, *supra*; laws for free text books which discriminate against the indigent, Johnson v. New York State Education Department, 449 F.2d 871 (2nd Cir. 1971). Here the State has established the schools, available to all without cost. The classification claimed

invidious is not the result of laws enacted by the State presently or historically, but the result of deficiencies created by the appellants themselves in failing to learn the English language. For this the Constitution affords no relief by reason of any of the Constitutional provisions under which appellants have sought shelter.

Furthermore, the determination of what special educational difficulties faced by some students within a State or School District will be afforded extraordinary curative action, and the intensity of the measures to be taken, is a complex decision, calling for significant amounts of executive and legislative expertise and non-judicial value judgments.[17] As with welfare, (to which these claims are closely akin), the needs of the citizens must be reconciled with the finite resources available to meet those needs. See Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

■ As long as there is no discrimination by race or national origin, as has neither been alleged nor shown by appellants with respect to this issue, the States should be free to set their educational policies, including special programs to meet special needs, with limited judicial intervention to decide among competing demands upon the resources at their commands, subject only to the requirement that their classifications be rationally related to the purposes for which they are created.

*Dandridge, supra,* also tells us that "the Equal Protection Clause does not require that a State must choose be-

---

15. McLaurin v. Regents for Higher Education, 339 U.S. 637, 70 S.Ct. 851, 94 L. Ed. 1149 (1950), requires no more. There, a Black Ph.D. candidate, whom the segregated state university had admitted pursuant to court order, was assigned to a particular seat in the classroom in a row designated for Black students, to a Black table in the main reading room of the library, and to a specific table in the cafeteria. The Court held that these practices violated the Equal Protection Clause, as it was defined before *Brown*. It ordered the school to accord the Black

student the same treatment as other students in such matters. Appellees in the case before us have done no less.

16. Note 1 *supra*, and accompanying text.

17. Appellants would have the court direct the type of instruction to be afforded them for remedial purposes even though there is a dispute among the experts as to whether bilingual teachers are better for this purpose than those who teach English as a Separate Language. The courts should not be called upon to make pedagogic judgments.

tween attacking every aspect of a problem or not attacking the problem at all." 397 U.S. at 486–487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491. This echoes the language of McDonald v. Board of Election Commissioners, 394 U.S. 802, 809, 89 S.Ct. 1404, 1409, 22 L.Ed.2d 739 (1969), that,

> "a legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563] (1955); and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."

*Accord*, Schlib v. Kuebel, 404 U.S. 357, 364, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971), rehearing denied, 405 U.S. 948, 92 S.Ct. 930, 30 L.Ed.2d 818 (1972); Johnson v. Education Department, 449 F.2d 871, 877 (2d Cir. 1971); Briggs v. Kerrigan, 431 F.2d 967, 968–969 (1st Cir. 1970).

Judged by this standard, the administration of the compensatory education program for non-English-speaking Chinese children in the San Francisco Unified School District passes constitutional muster. Prior to the institution of this litigation, remedial instruction was provided as part of a pilot program.[18] As such, emphasis would quite reasonably be on experimentation. Therefore, some children were given all their academic instruction within the program, and some were taken out of the regular school structure only part-time; some pupils were taught by bilingual teachers, and some received their instruction by the more intensive ESL method.[19] Because of limited finances and the exploratory nature of the efforts, not all lingually deficient Chinese children took part.[20]

With due regard to the nature of the School District's efforts, nothing before this court would indicate that the program has been managed so as to invidiously discriminate against appellants. We find that appellees have not violated appellants' rights to equal protection in the administration of the compensatory program for non-English-speaking Chinese students within the District.

The judgment is affirmed.

IRVING HILL, District Judge (dissenting):

I dissent.

In my view, the majority's construction of the Equal Protection Clause is too narrow. They fail to assign sufficient value and importance to the rights plaintiffs assert in this case. A child's right to an equal educational opportuni-

18. In addition to the stipulated facts as to the numbers of Chinese and the portion of the total who need remedial help, the court found:

> "Defendants [Appellees] recognize the importance of an education and equal educational opportunities, and make education available to plaintiffs [appellants] on the same terms and conditions as it is available to other groups within the School District."

> "This Court recognizes that defendants have made efforts toward remedial education programs for Chinese-speaking students, although whether such efforts are effective or in need of substantial improvement is a conclusion which the Court does not make." C.T. at 419.

19. The record discloses that the 1,066 Chinese-speaking students who receive help (*supra*, footnote 1) consist of 487 Elementary School students (Grades 1–6 and Kindergarten), 342 Junior High School students and 237 Senior High School students. The 487 Elementary School students include a total of 45 who are of Kindergarten level. (C.T. at 239).

20. The Chinese Bilingual Education Budget of the San Francisco Unified School District for the period 1966–1971 reflects the following allocations for the program:
   - 1966–67—0
   - 1967–68—$88,016
   - 1968–69—$280,469
   - 1969–70—$432,969
   - 1970–71—$1,092,009

(C.T. at 375).

ty is of the greatest importance and should not be abridged without persuasive justification. No such justification was presented to the trial court because that court held, at the threshold, that the facts presented by plaintiffs failed to make out a claim upon which relief could be granted under the Equal Protection Clause. While apparently conceding that plaintiffs have suffered a disadvantage in gaining an education as against English-speaking pupils, the trial court held that the disadvantage did not come within the scope of the Equal Protection Clause. The majority agree with that basic holding.

I would reverse the judgment and remand the case to the trial court for the taking of further evidence on defendants' justification, if any, for their failure to provide the bilingual teaching which plaintiffs seek. The facts already adduced show, in my opinion, that the San Francisco School System withholds from a readily identifiable segment of an ethnic minority the minimum English language instruction necessary for that segment to participate in the educational processes with any chance of success. I view such a deprivation as being *prima facie* within the ambit of the Equal Protection Clause.

The plaintiffs, and the class they represent, are grade school children of Chinese parents who have recently immigrated to this country. The law requires these children to attend school; so, they come. But they enter the San Francisco School System unable to speak or understand the English language. All the instruction they receive is in English as are all of the books and all of the visual materials which are used. As the *amicus* brief from the Harvard University Center for Law and Education puts it, education for these children becomes "mere physical presence as audience to a strange play which they do not understand." These *amici* correctly stress the fact that the essence of education: communication: a small child can profit from his education only when he is able to understand the instruction, ask and answer questions, and speak with his classmates and teachers. When he cannot understand the language employed in the school, he cannot be said to have an educational opportunity in any sense. As against his English-speaking classmates, his educational opportunity is manifestly unequal even though there is an illusion of equality since the facilities, books, and teachers made available to him are the same as those made available to the rest of the students. It seems clear to me that a pupil knowing only a foreign language cannot be said to have an educational opportunity equal to his fellow students unless and until he acquires some minimal facility in the English language.

Interestingly enough, defendants themselves appear to recognize the seriousness of the problem. Two particularly forceful quotations from official publications of the San Francisco Unified School District are set forth below.

"(W)hen these. [Chinese-speaking] youngsters are placed in grade levels according to their age and are expected to compete with their English speaking peers, they are frustrated by their inability to understand the regular work. . . . For [these] children, the lack of English means poor performance in school. The secondary student is almost inevitably doomed to be a dropout and become another unemployable in the ghetto." San Francisco Unified School District, Pilot Program: Chinese Bilingual, (May 5, 1969), pp. 3a; 6a, cited in Appellant's Opening Brief, p. 11.

"The immigrant family, in settling with its own people, has limited opportunities for assimilation into the American culture and language. Often, the immigrant student's only contact with the English language is during class time. After class, during lunch and recesses, the immigrant child tends to seek friends among other new arrivals. . . . In so doing, there develops a further bond of reinforcing the Chinese language. Few opportunities are afforded

. . . for the student to speak English once he is back home in Chinatown." Dr. Robert E. Jenkins, Superintendent of Schools, San Francisco Unified School District, Chinese Bilingual Education: A Preliminary Report (1968), Clerk's Transcript, p. 244.

The majority misapprehended the nature of the relief sought in this case. They characterize plaintiffs as seeking "bilingual education." Plaintiffs have carefully and repeatedly abjured any such objective. As the complaint clearly states (Clerk's Transcript, pp. 23, 24) and as plaintiffs' briefs in the trial court (Clerk's Transcript, p. 162) and in this Court re-emphasize, plaintiffs seek only that "defendants . . . provide special instruction in English and that such instruction . . . be taught by bilingual teachers." Appellant's Reply Brief, p. 12. When the majority emphasize that this is an "English-speaking nation" and that English is the "language of instruction" in all public schools, they set up a straw man which they have clothed in irrelevant truisms. Plaintiffs do not seek to be taught in Chinese, in whole or in part. They seek only to learn English. They claim, with apparent justification, that they cannot learn English effectively unless it is taught to them by persons who have a facility in the only language they understand, i. e., Chinese. It seems abundantly clear that as soon as the plaintiffs have achieved enough proficiency in English to understand their teachers and classmates and participate somewhat in the course of instruction, they will expect no further Chinese to be uttered in their classes. They do not seek instruction in the Chinese language or to be taught anything in Chinese except how to speak English.

As stated, I am of the opinion that the facts (which are all stipulated to) reflect, *prima facie*, an impermissible infringement of plaintiffs' rights under the Equal Protection Clause. Plaintiffs have shown (1) that they do not have the same opportunity as others and (2) that the group so deprived is an indentifiable segment of an ethnic minority.

As I understand the relevant legal principles, a *prima facie* denial of equal protection occurs whenever the method of classification with respect to the enjoyment or non-enjoyment of a governmental right, opportunity or obligation is "suspect." A classification is suspect whenever government action is linked with comparative disadvantage to members of a certain type of group. That group may be, *inter alia*, a religious, ethnic or political group or a group identifiable in terms of the members' sex or relative poverty.[1] Such classifications are suspect (and *prima facie* invalid) because these factors, i. e., religion, race, etc., are, except in extraordinary and rare instances, irrelevant and improper criteria in determining the scope or application of government rights, benefits, opportunities and obligations. They are suspect because, as one authority puts it, it is rarely the case that "proper governmental objectives . . . require for their achievement the carving out, for relatively disadvantageous treatment, of a class defined by [their racial or ethnic composition]." Michelman, The Supreme Court 1968 Term—Forward: On Protecting the Poor Through the Fourteenth Amendment, 83 Har.L.Rev. 7, 21 (1969).[2]

1. *See, e. g.,* Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1966) ; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) ; Chance v. Bd. of Examiners, 458 F.2d 1167 (2nd Cir. 1972).

2. In addition to being apparently arbitrary or irrational, Professor Michelman characterizes a suspect classification as one which has a high potential for abuse or for use as a tool by which a minority can be systematically deprived of equal access to the right and benefits the society offers. Furthermore, the criterion has a potential to hurt or stigmatize a group by implying official recognition of the group's inferiority or undeservingness. See Michelman, *supra,* at 20.

When government action particularly affects or burdens a given class or group, it is often called "discrimination." It is important to remember that no intent to discriminate is required in order to invoke the Equal Protection Clause. One can deal with an apparently neutral and non-discriminatory statute or scheme which is applied or enforced without any intent to discriminate (or even without knowledge that the effect is a discriminatory one) and still run afoul of the Equal Protection Clause if illegal discrimination in fact results.[3] When such action particularly affects or burdens one of the classes or groups mentioned above, it is presumptively illegal discrimination. However, not all discrimination is illegal. Discrimination which is apparently illegal may be excused by a showing that the discrimination or classification is justified by overriding governmental objectives and necessities.

As Judge Feinberg, in Chance v. Board of Examiners, 458 F.2d 1167 (2nd Cir. 1972), states: "[A] harsh racial [or ethnic] impact, even if unintended, amounts to an invidious *de facto* classification that cannot be ignored or answered with a shrug. At the very least, the Constitution requires that state action spawning such a classification 'be justified by legitimate state considerations.'" 458 F.2d at 1175.

The strength of the justification needed to overcome a *prima facie* violation of the Equal Protection Clause will vary depending on the nature of the right involved. When the right involved is a fundamental one, only a compelling state interest will justify its abridgment, and the discrimination must be necessary to the achievement of the overriding governmental interest. *See, e. g.*, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). *Cf.* Dillenburg v. Kramer, 469 F.2d 1222 (9th Cir. 1972). When the right involved is less fundamental, a less compelling reason may suffice to justify its abridgment, and the discrimination may be permitted as rationally related to the achievement of an overriding governmental aim. *See, e. g.*, Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Turning now to the rights involved in this case, it cannot be doubted that the right to equal educational opportunity is one of the most vital and fundamental of all of the rights enjoyed by Americans. The Supreme Court, in Brown v. Board of Education, characterized it as "perhaps the most important function of state and local governments" and observed that "(i)n these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied

---

3. As the Fifth Circuit states, *en banc*, in disposing of a Petition for Rehearing in the case of Hawkins v. Town of Shaw, Miss., 437 F.2d 1286 (5th Cir. 1971):
    "In order to prevail in a case of this type it is not necessary to prove intent, motive or purpose to discriminate on the part of city officials. We feel that the law on this point is clear, for '"equal protection of the laws" means more than merely the absence of governmental action designed to discriminate; . . . "we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and to public interest as the perversity of a willful scheme".' Norwalk CORE v. Norwalk Redevelopment Agency, 2 Cir. 1968, 395 F.2d 920, 931." Hawkins v. Town of Shaw, Miss., Petition for Rehearing, 461 F.2d 1171 (5th Cir. 1972) at pp. 1172, 73. Furthermore, despite the fact that *Hawkins* arose in a situation where past historical discrimination could be inferred and where some evidence of present intent to discriminate was before the court, Judge Wisdom, in his concurrence in *Hawkins* on the Petition for Rehearing, makes clear that the case should "not be read to imply that our decision in this case was based even in part on proof of motive, purpose, or intent." 461 F.2d at 1174. *See also* Kenendy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2nd Cir. 1970), cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); United States ex rel. Seals v. Wiman, 304 F.2d 53 (5th Cir. 1962); Chance v. Bd. of Examiners, 458 F.2d 1167 (2nd Cir. 1972).

the opportunity of an education." 347 U.S. at 493, 74 S.Ct. at 691.

Thus, when defendants are given the opportunity to present their justification, their showing would necessarily be required to be persuasive in the extreme. The present record certainly shows no such justification. At best, it indicates that the defendant school board has made some effort to remedy the language deficiency of some of the Chinese-speaking students. That partial effort is not a full justification. It merely goes to reduce the dimensions of the problem.

The defendants could be allowed to show, in the resumed trial, the limits of their resources, the conflicting demands made upon those resources, and their judgment as to the priorities to be applied to those resources and demands. And the court would then decide whether the defendants are justified in their refusal to provide bilingual instruction for the teaching of English to all of the Chinese-speaking pupils who require it.

The majority apparently foreclose plaintiffs from relief under the Equal Protection Clause because their language deficiency was not "caused directly or indirectly by any state action." In other words, the majority see the Equal Protection Clause as available only when the inequality or discrimination results from some present intent to discriminate or from some past or historical governmental discriminatory conduct for which the state can be blamed. The majority cite no previous decision which so limits the scope of the Equal Protection Clause. It is true that most, if not all, of the decided cases requiring remedial action to redress educational deprivation arose where there was a history of un-

equal treatment by the state of the class involved. But none of the opinions hold that historical disadvantage attributable to the state is a *sine qua non* for obtaining relief.

In another group of cases it is clear that relief is granted under the Equal Protection Clause where no historical blame can be placed upon the state. These cases deal with the obligation of the state to provide special services to criminal defendants who are unable to pay for those services themselves. Some of these Supreme Court opinions on the subject are collected in the footnote.[4] These cases stand for the proposition that a person's poverty may not be the basis for denying him the same facilities and aids in combatting criminal charges against him as are enjoyed by those who can pay for such facilities and aids with their own funds. Affirmative state action is required to redress the inequality, and the state's duty to redress is imposed without reference to whether or not it can be said that the state in some way caused the inequality in the first place. The state's duty to take affirmative action does not arise because it can be said that the state is primarily responsible for making a poor man poor. Rather, the duty arises because the state must put justice within reach of every man if the state chooses to provide a system of criminal justice at all. Similarly, when the state chooses to provide education and makes attendance at school compulsory, it has a duty to grant to each child an equal educational opportunity and a duty to avoid illegal discrimination. That duty does not arise because of the existence of either a present intent to discriminate or past historical discrimination. Rather, the duty arises because once the state choos-

4. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed. 811 (1963); Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed. 2d 493 (1966); Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967). In *Roberts*, the Supreme Court

stated that "(o)ur decisions for more than a decade now have made clear that differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution." 389 U.S. at 42, 88 S.Ct. at 196.

es to put itself in the business of educating children, it must give each child the best education its resources and priorities allow.

One last word. The plaintiffs in this case are small, Chinese-speaking children who sue on their own behalf and on behalf of others similarly situated. The majority describe the plight of these children as being "the result of deficiencies created by the appellants themselves in failing to learn the English language." To ascribe some fault to a grade school child because of his "failing to learn the English language" seems both callous and inaccurate. If anyone can be blamed for the language deficiencies of these children, it is their parents and not the children themselves. Even if the parents can be faulted (and in many cases they cannot, since they themselves are newly arrived in a strange land and in their struggle for survival may have had neither the time nor opportunity to study any English), it is one of the keystones of our culture and our law that the sins of the fathers are not to be visited upon the children.

## ON REJECTION OF EN BANC CONSIDERATION
### ORDER

On request of a member of the court who was not a member of the panel, proceedings were commenced in February 1973 to obtain a vote of the court to consider the case en banc.

All members of the court in active service have considered the request for en banc consideration. A majority of the court has rejected the request.

Judge Hufstedler, with whom Judge Ely concurs, files an opinion dissenting from the rejection of en banc consideration.

Judge Trask, with whom Judge Wright concurs, files a special concurring opinion.

HUFSTEDLER, Circuit Judge, with whom Judge Ely concurs, dissenting from the denial of hearing en banc:

I dissent from the rejection of en banc consideration. The case presents unusually sensitive and important constitutional issues. The majority opinion states principles of statutory and constitutional law that cannot be reconciled with controlling authority. Unless these principles are corrected now, the protections of the Civil Rights Acts will be seriously impaired in this Circuit.

The majority opinion correctly identifies the two groups of children who brought this action: (1) 1,790 Chinese school children who speak no English and are taught none, and (2) 1,066 Chinese children who speak no English and who receive some kind of remedial instruction in English. The majority's characterization of the relief sought as "bilingual education" is misleading. The children do not seek to have their classes taught in both English and Chinese. All they ask is that they receive instruction in the English language.

Access to education offered by the public schools is completely foreclosed to these children who cannot comprehend any of it. They are functionally deaf and mute. Their plight is not a matter of constitutional concern, according to the majority opinion, because no state action or invidious discrimination is present. The majority opinion says that state action is absent because the state did not directly or indirectly cause the children's "language deficiency", and that discrimination is not invidious because the state offers the same instruction to all childen. Both premises are wrong.

The state does not cause children to start school speaking only Chinese. Neither does a state cause children to have black skin rather than white nor cause a person charged with a crime to be indigent rather than rich. State action

depends upon state responses to differences otherwise created.

These Chinese children are not separated from their English-speaking classmates by state-erected walls of brick and mortar (*Cf.* Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873), but the language barrier, which the state helps to maintain, insulates the children from their classmates as effectively as any physical bulwarks. Indeed, these children are more isolated from equal educational opportunity than were those physically segregated blacks in *Brown*; these children cannot communicate at all with their classmates or their teachers.

The state's response to the non-English speaking Chinese children is not passive. The state compels the children to attend school (Cal.Educ.Code § 12101), mandates English as the basic language of instruction (Cal.Educ.Code § 71),[1] and imposes mastery of English as a prerequisite to graduation from public high school (Cal.Educ.Code § 8573).[2] The pervasive involvement of the state with the very language problem challenged forbids the majority's finding of no state action. (E. g., Bullock v. Carter (1972) 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; Burton v. Wilmington Parking Authority (1961) 365 U.S.

715, 81 S.Ct. 856, 6 L.Ed.2d 45; Shelley v. Kraemer (1948) 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Nixon v. Condon (1932) 286 U.S. 73, 52 S.Ct. 484, 76 L. Ed. 984).

The majority opinion concedes that the children who speak no English receive no education and those who are given some help in English cannot receive the same education as their English speaking classmates. In short, discrimination is admitted. Discriminatory treatment is not constitutionally impermissible, they say, because all children are offered the same educational fare, *i. e.*, equal treatment of unequals satisfies the demands of equal protection. The Equal Protection Clause is not so feeble. Invidious discrimination is not washed away because the able bodied and the paraplegic are given the same state command to walk.

The majority holdings are contrary to a cascade of Supreme Court authority. Although the majority opinion acknowledges the existence of many of these cases, it attempts to circumvent them by reducing state action concepts to levels unacceptable for a hundred years and by drawing distinctions to confine the prior cases to an uncharted jurisprudential territory remote from the San Francisco schools. The great equal protection cas-

---

1. Cal.Educ.Code § 71:

"English shall be the basic language of instruction in all schools.

"The governing board of any school district and any private school may determine when and under what circumstances instruction may be given bilingually.

"It is the policy of the state to insure the mastery of English by all pupils in the schools; provided that bilingual instruction may be offered in those situations when such instruction is educationally advantageous to the pupils. Bilingual instruction is authorized to the extent that it does not interfere with the systematic, sequential, and regular instruction of all pupils in the English language.

"Pupils who are proficient in English and who, by successful completion of advanced courses in a foreign language or by other means, have become fluent in that language may be instructed in classes conducted in that foreign language."

2. Cal.Educ.Code § 8573:

"No pupil shall receive a diploma of graduation from grade 12 who has not completed the course of study and met the standards of proficiency prescribed by the governing board. Standards of proficiency in basic skills shall be such as will enable individual achievement and ability to be ascertained and evaluated. Requirements for graduation shall include:

(a) English.

(b) American history.

(c) American government.

(d) Mathematics.

(e) Science.

(f) Physical education, unless the pupil has been exempted pursuant to the provisions of this code.

(g) Such other courses as may be prescribed."

es cannot be shrivelled to the size the majority opinion has prescribed.

Even if the strict scrutiny test were inapplicable, the Chinese children made out a prima facie case. A claim of invidious discrimination against those who could speak and write only Chinese came to the Supreme Court almost 50 years ago in Yu Cong Eng v. Trinidad (1926) 271 U.S. 500, 49 S.Ct. 619, 70 L.Ed. 1059. The Philippines had enacted a statute requiring business account books to be kept solely in English, Spanish, or any local dialect. The petitioner, a Chinese merchant who could neither speak nor write any language except Chinese challenged the statute on due process and equal protection grounds. The Philippine statute, like the California statutes here involved, was facially neutral. Mr. Chief Justice Taft, speaking for a unanimous court, struck down the statute as a denial of equal protection.[3]

The classifications that are relevant to our equal protection problem in this case can be defined in a number of ways. It is unnecessary to describe more than three of them to structure the constitutional inquiry. The narrowest classification created by state action is this: (1) all Chinese school children in the district who can speak English versus (2) all Chinese school children in the district who cannot speak English and are taught no English, represented by a group of 1,-790 plaintiffs. Children in the first class have full access to education; those in the second have none. The sole difference between them is linguistic. Is the denial of instruction to learn English—and hence to learn anything—rationally related to any legitimate state end? The state offers no rationale, and I am unable to discern any.

A second classification is: (1) all Chinese school children who do not speak English and are taught none versus (2) (a) children identically situated who receive six hours per day of special instruction, represented by a group of 433 plaintiffs, and (2)(b) children also identically situated who receive one hour per day of special instruction, represented by a group of 633 plaintiffs. Although some special education is provided, it is not made available to all on an equal basis. (See Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Griffin v. Illinois (1956) 351 U.S. 12, 76 S.Ct. 585, 100 L. Ed. 891.) Nothing appears on the face of the record to explain why children are placed in one class rather than another. It is thus impossible to determine whether the basis of distinction has any rational connection to any legitimate state aim.[4]

A third classification is: (1) all Chinese non-English speaking children who receive some remedial tutelage in English versus (2) all of their classmates who speak English. It is conceded that children in the first class have much narrower access to education than children in the second. Is there a rational basis for declining to bridge the educational gap between the two classes? Again the state has not been required to

3. In our case, unlike *Yu Cong Eng*, there is no indication that California intended the language statutes to injure Chinese. But it is now abundantly clear that good faith is irrelevant if in fact the impact of state action is discriminatory. *E. g.*, Burton v. Wilmington Parking Authority, *supra*, 365 U.S. 715, 725, 81 S.Ct. 856; *cf.* Baker v. Carr (1962) 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. California's record of deliberate discrimination against Chinese and Japanese is nevertheless lengthy. One of the sadder chapters in that melancholy history was an order of the San Francisco school board in October, 1906, compelling all Oriental chil-

dren to attend a segregated school in Chinatown. The order was ultimately withdrawn under pressure of litigation, of Congress, and of the President of the United States. McWilliams, Prejudice p. 26 (1944).

4. This is not a case like Dandridge v. Williams (1970) 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, where there was a clear basis for distinguishing between welfare recipients stated in the regulation at issue. The requirements of *Dandridge*—"It is enough that the State's action be rationally based and free from invidious discrimination." (*Id.* at 487, 90 S.Ct. at 1162)—have not been met in this case.

supply one, and there is no showing in the record that those children, or any portion of them, in the first class are afforded a meaningful opportunity to a minimum public education. Here, as in Bullock v. Carter (1972) 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; Reed v. Reed (1971) 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225; Tate v. Short (1971) 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130; Williams v. Illinois (1970) 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586; Douglas v. California (1963) 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811; Griffin v. Illinois (1956) 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Yick Wo v. Hopkins (1886) 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, the state has participated in discriminating against a clearly identifiable class and its failure to remedy the discriminatory practice has not been justified at all.

The state did not meet even its minimal burden. But its obligation was to meet the far more stringent test of strict scrutiny. The Chinese children have met prima facie even the rigorous standards of San Antonio Independent School District v. Rodriguez (1973) 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16: (1) They are members of a class precisely identifiable, (2) the state has participated in discriminating against them, (3) the children who speak no English and are taught none are absolutely deprived of education and it has not been shown that those who are taught some English have a meaningful access to an adequate education. San Antonio Independent School District v. Rodriguez is the most recent pronouncement in a lengthy chain of equal protection cases. But even if it stood alone, *San Antonio Independent School District* would compel reversal.

TRASK, Circuit Judge, with whom Judge WRIGHT concurs, specially concurring in the rejection of en banc consideration:

A basic misapprehension of the factual situation seems to color, if not pervade, the dissent from the court's refusal to grant en banc consideration. This appears from the statement that "the majority opinion concedes that the children who speak no English *receive no education. . . .*" The stipulation upon which the case was submitted for decision [footnote 1 of majority opinion] refers to 2,856 Chinese-speaking students in the school district "who need *special instruction* in English." It continues by dividing those students into one group who receive designated amounts of special help in English and those who do not. Those who do not, however, are not assumed "to receive no education." Although some do not receive special help, there is no indication that they are not exposed to whatever English courses are afforded. The majority opinion does not equate the need for "special help" in English with receiving "no education."

Little comfort for the dissent may be found in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Although the Chinese here were an identifiable group "who needed special help in English" [Stipulation, footnote 1], they were a small portion of approximately 15,500 Chinese students. It is not difficult to assume that they were part of an even larger group of students "who need special help in English." As the Court recognized in *Rodriguez* the Equal Protection Clause does not, where wealth is involved, "require absolute equality or precisely equal advantages." Continuing,

"Nor, indeed, in view of the infinite variables affecting the educational process, can any system assure equal quality of education except in the most relative sense." 411 U.S. at 24, 93 S.Ct. at 1291.